# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

UNITED STATES OF AMERICA

v.                                              CRIMINAL CASE NO.

1:14-cr-00427-ELR-RGV

RODRICUS MARTIN

## ORDER FOR SERVICE OF FINAL REPORT,
## RECOMMENDATION, AND ORDER

Attached is the Final Report, Recommendation, and Order of the United States

Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and Local Criminal

Rule 59(2)(a)-(b).  Let the same be filed and a copy, with a copy of this Order, be

served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any,

to the Report and Recommendation within fourteen (14) days of receipt of this

Order.  Should objections be filed, they shall specify with particularity the alleged

error(s) made (including reference by page number to the transcript if applicable)

and shall be served upon the opposing party.  The party filing objections will be

responsible for obtaining and filing the transcript of any evidentiary hearing for

review by the District Court.  Failure to object to this Report and Recommendation

waives a party's right to review.  Fed. R. Crim. P. 59(b)(2).

Pursuant to Title 18, U.S.C. § 3161(h)(1)(D) and (H), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act, whether or not objections are actually filed.** The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED** and **DIRECTED**, this 29th day of June, 2015.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

UNITED STATES OF AMERICA

v.

RODRICUS MARTIN

CRIMINAL CASE NO.

1:14-cr-00427-ELR-RGV

**MAGISTRATE JUDGE'S FINAL REPORT,
RECOMMENDATION, AND ORDER**

Defendant Rodricus Martin ("Martin") is charged with possession of a firearm after a felony conviction, in violation of 18 U.S.C. § 922(g), and possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). [Doc. 1].[1]  Martin has filed a motion to suppress statements, [Doc. 15], and a motion to suppress evidence, [Doc. 16].  Following an evidentiary hearing on March 5, 2015,[2] the parties filed post-hearing briefs on the pending motions.  See [Docs. 27, 30 & 31].

---

[1] The listed document and page numbers in citations to the record in this Final Report, Recommendation, and Order refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] See [Doc. 26] for the transcript of the evidentiary hearing.  Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)."  In addition, the parties submitted exhibits during the hearing, which will be referred to as "(Gov. Ex. __)" for the government's exhibits and "(Def. Ex. __") for Martin's exhibits.

For the reasons that follow, it is **RECOMMENDED** that Martin's motions to suppress, [Docs. 15 & 16], be **DENIED**.

## I. STATEMENT OF FACTS

On September 19, 2013, Investigator Gary Walker, Jr. ("Inv. Walker"), of the Atlanta Police Department ("APD"), received a "lead sheet" about possible drug distribution activity at a residence located at 670 Florence Place, N.W., Atlanta, Georgia ("the residence").  See [Doc. 16-3 at 3].  Beginning on March 18, 2014, Inv. Walker periodically conducted surveillance "night and day" at the residence, usually over the course of three to four days at a time.  [Id.].  Between March 18 and March 20, 2014, Inv. Walker observed "a little activity" at the residence, and from March 24 to March 26, 2014, he observed no activity at the residence.  [Id.].  On two occasions in late March and early April, 2014, Inv. Walker observed someone he described as a bald, heavy set, black male at the residence.  [Id.].  Between March 31 and April 3, 2014, he observed some "pedestrian traffic" at the residence, and between April 7 and April 10, 2014, Inv. Walker observed both vehicle traffic and pedestrian traffic at the residence, and he again observed the same black male he had previously seen at the location, but this time in the company of two females. [Id.].

On April 2, 2014, a Confidential Source ("CS"), who was cooperating with APD Narcotics Team 4, made a controlled purchase of $20.00 worth of crack cocaine at the residence.  [Doc. 16-1 at 2].  The CS was searched and briefed on the operation and then dropped off in front of the residence.  [Id.].  Another APD Investigator observed the CS knock on the door and walk into the residence.  [Id.].  The CS reported that, once inside, he asked for $20.00 worth of crack cocaine, and a black male gave him four  plastic baggies of crack cocaine in exchange for $20.00 in funds provided to the CS by the APD.  [Id.].  The CS left the residence after completing the transaction and turned over to the APD Investigators the baggies he had purchased, and the contents were field tested, yielding a positive result for crack cocaine.  [Id.].  The CS was searched again and debriefed, and he reported that the black male inside the residence had a black handgun in his possession.  [Id.].

On April 17, 2014, the CS returned to the residence and conducted another controlled purchase of crack cocaine.  [Id.].  As on the prior occasion, the CS was searched and briefed on the operation and then dropped off in front of the residence. An APD Investigator observed the CS walk up to the door, knock and enter the residence.  [Id.].  The CS asked for $20.00 worth of crack cocaine, and a black male gave him four plastic baggies of crack cocaine in exchange for $20.00 in funds provided to the CS by the APD.  [Id.].  The CS left the residence after completing the

transaction and turned over to the APD Investigators the baggies he had purchased, and the contents were field tested, yielding a positive result for crack cocaine.  The CS was searched again and debriefed.  [Id.].

On April 18, 2014, the day after the second controlled purchase, Inv. Walker applied for a search warrant for the residence at 670 Florence Place, N.W., Atlanta, Georgia, "[b]ased on the information received from and observed by the [CS], the confirmation of that information by [Inv. Walker's] investigation, observations and during [his] period of surveillance during the two Confidential Source Purchases, resulting in the recovery of crack cocaine." (Def. Ex. 5).  Magistrate Richard E. Hicks of the Fulton County Superior Court issued a warrant authorizing the search of the residence for illegal narcotics, weapons, contraband, and other evidence of drug trafficking.  (Def. Ex. 6).

At approximately 8:00 a.m. on April 24, 2014, a team of APD officers, armed and wearing tactical gear, drove to the residence in a raid truck to execute the search warrant.  (Tr. at 9, 27; Def. Ex. 1).  Inv. Walker and seven other APD officers on the entry team approached the front door of the residence in a stack.  (Tr. at 18, 25; Def. Ex. 1 at 1:10–1:48).  After announcing their presence, the officers forcibly opened burglar bars covering the front door and breached the door using a battering ram.[3]

_____

[3] The video admitted as Def. Ex. 1 at the evidentiary hearing was taken from a camera on the shield carried by the first officer in the stack.  (Tr. at 15-16).  The

(Tr. at 29–30; Def. Ex. 1 at 1:46–2:00).  The lead officer in the stack carrying the shield initially stood in the open doorway as officers again announced, "Atlanta police search warrant," and gave commands for the occupants of the residence to come out.  (Tr. at 15; Def. Ex. 1 at 2:00–2:08).  Martin emerged from the front bedroom wearing only shorts,[4] and he walked under his own power toward the officers at the front door as directed, and upon exiting the residence, Martin was arrested and handcuffed on the front porch.  (Tr. at 10; Def. Ex. 1 at 2:12–2:20).  A female carrying a young child subsequently emerged from the bedroom and walked toward the front door as directed, exiting the residence.  (Tr. at 10; Def. Ex. 1 at 2:27–2:35).  The officers then cleared the remainder of the residence in less than five minutes.[5]  (Def.

---

video depicts the officers approaching the front door, and an officer can be heard announcing, "Atlanta police search warrant," in a loud voice before another officer attaches what appears to be a crowbar and chain to the burglar bars covering the front door.  (Def. Ex. 1 at 1:40–1:49).  Approximately six seconds after the first announcement, one of the officers forcibly opens the burglar bars by pulling on the chain connected to the crowbar.  (Id. at 1:48–52).  The officer who made the first announcement again repeats in a loud voice, "Atlanta police search warrant," and officers then begin to breach the front door, approximately 10 seconds after the first announcement was made.  (Id. at 1:48–1:59).

[4] An officer later retrieved a shirt and pants for Martin.  (Tr. at 13-14; Gov. Ex. 1 at 00:06–00:20 (video depicting Martin wearing shirt and pants)).

[5] Near the end of the video, Martin is seen sitting on the front porch steps with his hands handcuffed behind his back.  (Def. Ex. 1 at 5:50).

Ex. 1 at 2:36–6:00). During the execution of the search warrant, officers found drugs and guns, among other items, in the residence. (Tr. at 10).

Inv. Walker testified at the evidentiary hearing that while Martin was on the front porch of the residence, "he made a voluntary utterance that everything in the house belonged to him." (Tr. at 10). According to Inv. Walker, when Martin came out of the house, he "was acting very frantic, nervous, panicking, sweating, breathing heavily." (Tr. at 11). Martin did not ask for medical attention, but APD officers requested an ambulance because, based on how he was sweating, officers thought that Martin may have swallowed some type of substance. (Tr. at 11-12). After sitting on the front porch steps for some period of time with his hands cuffed behind his back,[6] Martin was escorted to the raid truck and seated in the back of the truck with the doors open. (Tr. at 45; Gov. Ex. 1 at 00:06–00:28). Martin walked to the truck under his own power but was assisted as he stepped up to enter the rear of the raid truck. (Gov. Ex. 1 at 00:06–00:25).

After Martin was seated in the rear of the raid truck, Sergeant Carlo Peek ("Sgt. Peek") and Investigator Nicholas Chimino ("Inv. Chimino") approached Martin, and Sgt. Peek advised him of his <u>Miranda</u>[7] rights. (Tr. at 71–72; Gov. Ex. 1

---

[6] While seated on the porch steps, Martin said that he felt faint, and at some point also complained about his breathing. (Tr. at 46).

[7] <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

6

at 00:50–1:23).   Martin agreed to speak with the officers, and the interview was conducted in the back of the raid truck where Martin remained seated and handcuffed.  (Gov. Ex. 1 at 1:18–16:20).  The interview lasted approximately 15 minutes.  See (id.).  During the interview Inv. Chimino asked Martin if he was feeling better, and Martin responded, "Little bit."  (Gov. Ex. 1 at 9:10–9:13; Gov. Ex. 2 at 7).  The two men then had an exchange regarding whether Martin may have swallowed drugs, but Martin adamantly denied that he had.  (Gov. Ex. 1 at 9:25–10:00; Gov. Ex. 2 at 7–8).[8]

Shortly after Martin finished speaking with Sgt. Peek and Inv. Chimino, an ambulance arrived and an EMT examined Martin just outside the rear of the raid truck.  (Gov. Ex. 1 at 18:38–19:10).  Martin was then escorted to the ambulance where he remained for approximately 11 minutes.  See (id. at 19:34–31:20).  Before leaving the ambulance, Martin signed a form indicating that he refused medical treatment.  (Gov. Ex. 3; Tr. at 80).  Martin was then escorted back to the raid truck where he was placed in the rear of the truck with the doors open.  (Gov. Ex. 1 at 3:20–3:48).  At this time, Task Force Officer Brian Ernest ("TFO Ernest") approached Martin and again advised him of his Miranda rights, and Martin agreed to speak to TFO Ernest.  (Id. at 32:17–33:10; Gov. Ex. 4 at 3–4; Tr. at 102).  Martin remained seated in the back of

---

[8] The recording of their conversation is partially inaudible.  See generally (Gov. Ex. 2).

the raid truck, and TFO Ernest did not notice that Martin was sweating or in any distress. (Tr. at 98, 104). Martin did comment during the course of the interview that his head was "not working so good," (Gov. Ex. 1 at 33:40–33:51; Gov. Ex. 4 at 4; Tr. at 98, 104), but he did not ask for any medication or medical treatment, (Tr. at 98–99; Gov. Ex. 4 at 2–6). The interview lasted approximately 10 minutes, and Martin admitted that the drugs and guns found in the residence belonged to him. (Gov. Ex. 1 at 31:46–38:40; Gov. Ex. 4 at 5-6 (TFO Ernest: "So the bedroom when you first walk in there . . ., that's your bedroom? All right. Whose firearms are those?" Martin: "Everything in there's mine.")).

## II.  DISCUSSION

### A.  Motion to Suppress Evidence

#### 1.  *Search Warrant Supported by Probable Cause*

Martin moves to suppress the evidence obtained from execution of the search warrant, arguing that the "scant information" provided in the affidavit in support of the search warrant did not support probable cause, and he also "challenges the affiant's claim that his surveillance activities supported probable cause." [Doc. 16 at 6].[9] Specifically, Martin contends that "the information submitted in support of

---

[9] Martin initially also challenged the staleness of information presented in the affidavit in support of the search warrant application, [Doc. 16 at 6], but in his post-hearing brief, Martin states that he no longer contends that the information was stale, [Doc. 30 at 12–13]. Accordingly, his staleness argument is deemed abandoned.

establishing probable cause is largely based upon information supplied by a [CS] as to whose reliability there is no information whatsoever." [Doc. 30 at 13]. Martin further asserts that "the surveillance logs of [Inv.] Walker for the location do not provide sufficient support for the [CS's] information." [Id.]. Martin argues that "the surveillance log is not supportive of the inference of drug activity in light of the absence of traffic for all surveillance entries except one and thus should have been disclosed to the Magistrate Judge for a fair consideration of whether there was probable cause to support the warrant." [Id. at 4].

Martin presents a facial challenge to the validity of the search warrant, and the standard of review on such a challenge is a deferential one. United States v. Miller, 24 F.3d 1357, 1363 (11th Cir. 1994). The Eleventh Circuit has summarized the essence of the Court's review as follows:

> When called upon by law enforcement officials to determine the legitimacy of search warrants and their supporting affidavits, issuing magistrates and reviewing courts alike must strike a delicate balance between constitutional guarantees against excessive intrusions into areas of individual freedom and the Government's need to access and to secure relevant evidence in criminal prosecutions. In particular, issuing magistrates are given the unenviable task of making "firing line" decisions that attempt to encourage availment of the warrant process while simultaneously striving to protect citizens from

---

See United States v. Cadet, Criminal Action Nos. 1:11–CR–00522–WBH–LTW, 1:11–CR–00113–WBH–LTW, 2013 WL 504892, at *9 (N.D. Ga. Jan. 16, 2013), adopted by 2013 WL 504815, at *1 (N.D. Ga. Feb. 8, 2013), aff'd, 574 F. App'x 917 (11th Cir. 2014) (per curiam) (unpublished).

unwarranted governmental interference.   In recognition of the difficulty inherent in discharging this responsibility, reviewing courts lend substantial deference to an issuing magistrate's probable cause determinations.

Id.

"In attempting to ensure that search warrant affidavits comply with the Fourth Amendment's prohibition against unreasonable searches and seizures resultant from warrants issued without probable cause, the issuing magistrate 'is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place."   Id. at 1361 (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)); see also United States v. Betancourt, 734 F.2d 750, 754 (11th Cir. 1984).  "Probable cause deals 'with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"   Gates, 462 U.S. at 241 (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)).  See also Adams v. Williams, 407 U.S. 143, 149 (1972).   "Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations."

Miller, 24 F.3d at 1361 (citations omitted).  Furthermore, "the fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause." United States v. Fama, 758 F.2d 834, 838 (2d Cir. 1985) (citations omitted). See also Adams, 407 U.S. at 149 (citation omitted).  In short, the Court should uphold the finding of probable cause unless the finding was arbitrary. Betancourt, 734 F.2d at 754; United States v. Long, 674 F.2d 848, 852 (11th Cir. 1982).

Martin argues that the affidavit did not provide sufficient facts establishing probable cause to support issuance of the search warrant because the affidavit did not include any information about the reliability of the CS, and Inv. Walker's surveillance of the residence did not provide independent corroboration of the CS's information. [Doc. 30 at 12–16].  However, independent police corroboration of an informant is not required to establish probable cause. United States v. Brundidge, 170 F.3d 1350, 1353 (11th Cir. 1999) (per curiam).  Rather, the "'relevant considerations in the totality of the circumstances,'" are the informant's veracity and basis of knowledge, and "'a deficiency in one may be compensated for . . . by a strong showing as to the other.'" United States v. King, 233 F. App'x 969, 972 (11th Cir. 2007) (per curiam) (unpublished) (omission in original) (quoting Brundidge, 170 F.3d at 1353).

The basis of the CS's information in this case, as stated in the affidavit, was that he conducted two controlled purchases of crack cocaine at the residence under the supervision and surveillance of APD investigators. [Doc. 16-1 at 1–3]; (Def. Ex. 5). On each occasion, the CS was searched prior to the transaction, provided funds to make the purchase, and driven to the residence. [Doc. 16-1 at 1–3]; (Def. Ex. 5). An APD investigator watched the CS on both occasions walk up to the door of the residence, knock on the door and enter the residence. [Doc. 16-1 at 1–3]; (Def. Ex. 5). After conducting the transaction inside the residence with an individual he described as a black male, the CS exited the residence and provided the baggies of crack cocaine he purchased at the residence to the APD investigator. [Doc. 16-1 at 1–3]; (Def. Ex. 5). These facts, set forth in the affidavit, provided probable cause to believe that evidence of drug trafficking would be found at the residence. See United States v. Sutton, No. 8:04-CR-325-T-17TBM, 2007 WL 705044, at *5 (M.D. Fla. Mar. 2, 2007) (citation omitted) (citing Brundidge, 170 F.3d at 1353) ("The Eleventh Circuit has held that when a confidential informant witnesses first-hand the alleged wrongdoing, greater weight is given to the confidential informant's veracity and basis of knowledge . . . ."); United States v. Phillips, No. CR 306-016, 2007 WL 1428857, at *5 (S.D. Ga. May 10, 2007), adopted by 2007 WL 1655860, at *1 (S.D. Ga. June 5, 2007) (CI's recitation of facts surrounding controlled purchase were

corroborated through police surveillance of controlled purchase and because police confirmed defendant matched description given by informant and found a bag of cocaine on passenger in defendant's vehicle).

Martin complains that the affidavit did not include any information about the reliability of the CS, but he acknowledges that "[t]he informant's 'veracity' or 'reliability' and his 'basis of knowledge' are not viewed as independent prerequisites to a finding of probable cause: 'a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability,' such as corroborating evidence gathered by law enforcement." [Doc. 30 at 14 (quoting United States v. Foree, 43 F. 3d 1572, 1576 (11th Cir. 1995)]. This was not an instance in which the CS was a source of information that instigated an investigation. Instead, the CS assisted the APD in an ongoing investigation by making the controlled purchases of crack cocaine at the residence and only provided information about what transpired inside the residence, and this information was corroborated, in part, by the circumstances and surveillance of the controlled purchases. Moreover, the controlled purchases followed a report of possible drug trafficking at the residence and several weeks of surveillance at the residence. See [Doc. 16-3 at 3]. Martin contends that Inv. Walker should have disclosed the details of his surveillance to the magistrate since he saw

13

only one instance of suspicious activity during his surveillance, see [Doc. 30 at 13, 17], but the fact that his surveillance did not detect any trafficking activity on other days does not detract from the probable cause established by the two controlled purchases made at the residence by the CS.   Accordingly, Martin's motion to suppress evidence obtained from execution of the search warrant, [Doc. 16], is without merit.

**2.**     ***Initial Entry and Knock-and-Announce Requirement***

Martin argues that the officers who executed the search warrant violated the Fourth Amendment knock-and-announce requirement because no more than three to five seconds elapsed between the announcement of their presence and the breaching of the door, and the officers thus conducted a *de facto* "no knock" warrant without having been granted authority to do so. [Doc. 30 at 17–20]. Martin therefore argues that any items seized from the residence pursuant to the search warrant should be suppressed.  [Id. at 20].  However, Martin concedes that the exclusionary rule does not apply to a knock and announce violation under Hudson v. Michigan, 547 U.S. 586, 589 (2006), but citing Justice Kennedy's concurring opinion in Hudson, he requests that the Court find that there was a clear violation of the knock and announce requirement because the ruling in Hudson may be revisited if a pattern of violations were shown.  [Id.].

> Pursuant to 18 U.S.C. § 3109, a federal or state law enforcement officer
>
> may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

18 U.S.C. § 3109; see also United States v. McZilkey, No. CR 107-052, 2007 WL 3046498, at *4 (S.D. Ga. Oct. 16, 2007), adopted at *1.  That is, when executing a search warrant, "federal and state officers must provide the occupants of a house with notice of authority and purpose before breaking open any outer or inner door or window." United States v. Smith, Crim.A.No. 4-96-CR-15 HLM, 1996 WL 735569, at *2 (N.D. Ga. Aug. 27, 1996) (citations omitted).  "If the occupants do not admit the officers within a reasonable period of time, the officers may be deemed to be constructively refused admittance, and they may then enter by force." United States v. Gay, 240 F.3d 1222, 1228 (10th Cir. 2001) (citations and internal marks omitted).

"Section 3109 . . . comports with the Fourth Amendment, which generally dictates that 'law enforcement officers [executing search and arrest warrants] must announce their presence and provide residents an opportunity to open the door.'"[10]

---

[10] The Eleventh Circuit has held that while the Fourth Amendment does not explicitly set forth a knock-and-announce principle, the Amendment "incorporates the important common law requirement that police officers entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry." United States v. Segura-Baltazar, 448 F.3d 1281, 1289 (11th Cir. 2006) (citing Wilson v. Arkansas, 514 U.S. 927, 930, 934 (1995)).

15

United States v. Cole, Criminal Case No. 1:09–CR–0412–ODE–RGV, 2010 WL 3210963, at *20 (N.D. Ga. Aug. 11, 2010) (second alteration in original) (quoting Hudson, 547 U.S. at 589 (citation omitted)).  The statute "does not entitle a defendant to greater protections than does the Fourth Amendment." Segura-Baltazar, 448 F.3d at 1290 n.4 (citation and internal marks omitted).

Courts have held that there are no particular words or phrases officers must speak before entering.  See Storck v. City of Coral Springs, 354 F.3d 1307, 1318 (11th Cir. 2003) (citation omitted) ("[T]he Fourth Amendment normally requires little more notice than a knock on the door prior to a forced entry pursuant to a lawfully issued warrant . . .").  "The focus of the 'knock and announce' rule 'is properly not on what magic words are spoken by police,' or whether the police rang the doorbell, 'but rather on how these words and other actions of the police will be perceived by the occupant.'"  United States v. Pinson, 321 F.3d 558, 566 (6th Cir. 2003) (citation and internal marks omitted) (quoting United States v. Spikes, 158 F.3d 913, 925 (6th Cir. 1998)).  "The proper trigger point, therefore, is when those inside should have been alerted that the police wanted entry to execute a warrant."  Id. (citation and internal marks omitted).

Martin "has the burden of establishing a prima facie case that a knock and announce violation has occurred under § 3109, and overcoming the presumption of

[g]overnment propriety." United States v. Hromada, 49 F.3d 685, 689 n.7 (11th Cir. 1995) (citation omitted). The record demonstrates that the officers in this case approached the residence and announced their presence in a loud voice. (Def. Ex. 1 at 1:45–1:46). No one responded, so the entry team forcibly entered the residence by breaching the front door. (Id. at 1:47–2:00). Only approximately six seconds elapsed between the officers' announcement and their forcible opening of the burglar bars covering the front door, and a total of ten seconds elapsed from the first announcement to the beginning of the breaching of the door. (Id.). However, courts have found that a delay of five or more seconds is normally sufficient under 18 U.S.C. § 3109, see United States v. Jones, 133 F.3d 358, 361 (5th Cir. 1998) (per curiam) (citations omitted) ("Generally, a delay of five-seconds or less after knocking and announcing has been held a violation of 18 U.S.C. § 3109," while "more than 5 seconds" is normally sufficient); see also United States v. Morris, 436 F.3d 1045, 1049 (8th Cir. 2006) (citations omitted) ("[E]ntry into the residence of a drug trafficking suspect, ten seconds after knocking and announcing at a reasonable evening hour, was constitutionally reasonable."); United States v. Pennington, 328 F.3d 215, 221 (6th Cir. 2003) (finding no violation where officers forcibly entered residence eight to ten seconds after announcing their presence); Hromada, 49 F.3d at 689 (officers executing arrest warrant for drug offense did not violate knock and announce

17

requirement by waiting less than a minute after knocking to forcibly enter residence); United States v. Markling, 7 F.3d 1309, 1318 (7th Cir. 1993) (finding seven seconds was sufficient time to wait before using a battering ram to enter hotel room); United States v. Knapp, 1 F.3d 1026, 1030-31 (10th Cir. 1993) (finding 10 to 12 seconds was sufficient to wait).  Based on the evidence presented in this case, the Court finds that the officer did not violate the knock-and-announce requirement. See Segura-Baltazar, 448 F.3d at 1289; Smith, 1996 WL 735569, at *2.

Even if the officers were found to have violated the knock and announce requirement, Martin's argument that the evidence subsequently obtained should be suppressed as a result is without merit, because the Supreme Court has refused to apply the exclusionary rule to knock-and-announce violations.  See Hudson, 547 U.S. at 599 ("[T]he social costs of applying the exclusionary rule to knock-and-announce violations are considerable; the incentive to such violations is minimal to begin with, and the extant deterrences against them are substantial-incomparably greater than the factors deterring warrantless entries . . . . Resort to the massive remedy of suppressing evidence of guilt is unjustified."); see also United States v. Farias-Gonzalez, 556 F.3d 1181, 1187 (11th Cir. 2009) (citing Hudson, 547 U.S. at 596, 599); United States v. Neth, No. 6:09-cr-210-Orl-19GJK, 2010 WL 1257695, at *9 (M.D. Fla. Mar. 30, 2010) (alteration, citation, and internal marks

omitted) ("Suppression is not a remedy for a violation of the knock-and-announce rule."). Thus, the evidence should not be excluded on this basis as Martin "cannot parlay any violation of the knock-and-announce requirement into suppression of evidence." United States v. May, Criminal No. 10–0125–WS, 2010 WL 2985899, at *3 (S.D. Ala. July 27, 2010); see also United States v. Clark, No. CR411–349, 2012 WL 2317622, at *1 (S.D. Ga. June 18, 2012), adopted by 2012 WL 2792258, at *1 (S.D. Ga. July 9, 2012).[11]   Accordingly, it is **RECOMMENDED** that Martin's motion to suppress evidence, [Doc. 16], be **DENIED**.

## B.   Motion to Suppress Statements

Martin moves to suppress all statements he made following the execution of the search warrant on April 24, 2014.  [Doc. 15; Doc. 30 at 20–23].  Generally, the government may not use statements obtained as a result of custodial interrogation by law enforcement officers, unless the defendant has been advised of, and validly waived, his rights to remain silent and to the presence of retained or appointed counsel during questioning.  See United States v. Cottman, No. 07-25-JJF, 2007 WL 2122060, *6 (D. Del. July 25, 2007) (citing Miranda, 384 U.S. at 444).  There is no question that Martin was in custody when he made the challenged statements, and

---

[11] Moreover, Martin's reliance on Justice Kennedy's concurring opinion in Hudson as a basis for possible reconsideration of the Court's ruling in that case, [Doc. 30 at 19–20], is misplaced since there is no evidence in the record of a pattern of violations of the knock and announce requirement.

the government bears the burden of proving that his statements were voluntarily given.  Id. (citing Colorado v. Connelly, 479 U.S. 157, 168 (1986)).  See also Missouri v. Seibert, 542 U.S. 600, 608 n.1 (2004).  On this point, the Supreme Court has held that, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'"  Connelly, 479 U.S. at 167.

1.   *Pre-Miranda Statements*

Inv. Walker testified that after Martin exited the residence and was on the front porch, but before he was questioned or Miranda warnings had been provided, Martin "made a voluntary utterance that everything in the house belonged to him." (Tr. at 10).  With respect to this statement, Martin concedes "that by virtue of [Inv.] Walker's testimony that no questions were being posed to [him] at the time he made the statement on the porch, it would appear that the Court is not required to suppress that statement."  [Doc. 30 at 23].  Nevertheless, Martin argues that since Inv. Walker is the only source of testimony about what was said on the porch since it is not recorded, the Court should not credit Inv. Walker's testimony because he was not truthful with the Court about compliance with the knock and announce requirement.   [Id.].  The Court is not persuaded by Martin's argument.

Inv. Walker testified that the officers waited a reasonable amount of time after announcing their presence before breaching the door, and when asked on cross-

20

examination, "What is a reasonable amount of time in seconds or minutes, if you can?" he responded, "Fifteen, 20 seconds, 30 seconds." (Tr. at 18).  As noted earlier, the video recording of the entry indicates that the officers began breaching the front door about ten seconds after first announcing their presence.  (Def. Ex. 1 at 01:46–01:56).  The officers had to strike several blows to the door to actually get it open, requiring an additional four seconds, (id. at 1:56 to 2:00), and even after the door was successfully breached, the agents did not immediately enter the residence, but stayed at the doorway an additional ten seconds calling for the occupants to come out, (id. at 2:00 to 2:10).  Since courts have found that a delay of five or more seconds is normally reasonable, Inv. Walker's testimony that the officers waited a reasonable amount of time after announcing before breaching the door was accurate, and his first estimate of fifteen seconds was not materially different from the total time between the first announcement and the successful breaching of the door depicted on the video.  Thus, the Court finds that Inv. Walker did not provide untruthful testimony as Martin contends, and absent evidence that Martin's statements on the porch were the product of interrogation or its functional equivalent, the statements are not due to be suppressed.  See United States v. Washington, 431 U.S. 181, 187 (1977) ("Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently

desirable . . . . Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions.").[12]

### 2. *Post-Miranda Statements*

Martin also moves to suppress the statements he made after being moved from the porch to the rear of the raid truck. [Doc. 30 at 20–23]. The record demonstrates, and Martin acknowledges, that he received <u>Miranda</u> warnings before both interviews that were conducted while he was seated in the rear of the raid truck, so the only issue with respect to these statements is whether Martin validly waived his rights. [<u>Id.</u> at 21]. Martin contends that the government has not satisfied its burden of showing that he validly waived his rights given his "repeated expressions of physical distress." [<u>Id.</u> at 22]. The Court disagrees.

Aside from the dictates of <u>Miranda</u>, whether a statement was voluntarily given must be examined in light of the totality of the circumstances. <u>See</u> <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973); <u>Hubbard v. Haley</u>, 317 F.3d 1245, 1252 (11th Cir. 2003). This totality of circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of "an essentially free

---

[12] There is further support in the record for finding that Martin made a statement claiming ownership of everything in the house while he was on the porch. Near the beginning of his interview with Sgt. Peek in the back of the raid truck, Martin says, "Everything in there's mine, I done told you." (Gov. Ex. 1 at 1:50–2:01; Gov. Ex. 2 at 3).

and unconstrained choice." United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989). The focus of the voluntariness inquiry is whether the defendant was coerced by the government into making the statement: "[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421 (1986). Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police. See, e.g., Bustamonte, 412 U.S. at 226; Hubbard, 317 F.3d at 1253; United States v. Castaneda-Castaneda, 729 F.2d 1360, 1362-63 (11th Cir. 1984). Those cases where courts have found confessions to be involuntary "have contained a substantial element of coercive police conduct." Connelly, 479 U.S. at 164. "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." United States v. Jones, 32 F.3d 1512, 1517 (11th Cir. 1994) (per curiam) (citation and internal marks omitted). Likewise, courts consider the person's knowledge of the "substance of the charge"

against him.  West v. United States, 399 F.2d 467, 469 (5th Cir. 1968)[13] (determining the voluntariness of a juvenile's confession).

"No single factor is necessarily determinative of the issue whether a defendant knowingly and intelligently waived his rights but the court must engage in a fact-specific inquiry based on all of the circumstances."  United States v. Patterson, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *3 (N.D. Ga. Aug. 10, 2007). "[T]he totality of the circumstances must demonstrate a defendant waived his rights with a 'requisite level of comprehension.'"  United States v. Minard, 208 F. App'x 657, 660 (10th Cir. 2006) (unpublished) (quoting Moran, 475 U.S. at 421).  "'A waiver is knowing and intelligent only if it was made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'"  United States v. Wattree, 544 F. Supp. 2d 1262, 1274 (D. Kan. 2008) (internal marks omitted) (quoting Minard, 208 F. App'x at 660).  Thus, "'[a] defendant need not . . . understand all the consequences of the waiver.  He need only understand his right to remain silent or have his statements used against him.'"  Id. at 1274-75.

---

[13] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

24

Additionally, "[w]here a defendant argues that a medical condition or injury rendered his statements or confession involuntary, relevant considerations include the degree of pain, if any, experienced by the defendant, the nature of the interrogation and whether the defendant was awake and alert." United States v. Durr, No. 09-CR-6232L, 2010 WL 3199887, at *5 (W.D.N.Y. July 22, 2010), adopted by 2010 WL 3219369, at *1 (W.D.N.Y. Aug. 11, 2010) (citation and internal marks omitted) (citing Campaneria v. Reid, 891 F.2d 1014, 1019–20 (2d Cir. 1989)). "Only in extreme circumstances will a defendant's physical pain render his statements involuntary." Id. (citations omitted); see also Zayas v. Ercole, No. 08-CV-1037 (CBA), 2009 WL 6338395, at *8 (E.D.N.Y. Nov. 9, 2009), adopted in part by 2010 WL 1438113, at *1 (E.D.N.Y. Apr. 8, 2010) (citations omitted) ("An accused's medical condition will render his statement involuntary only if his injuries are severe and the accused does not appear alert, responsive, or oriented.").

After being advised of his Miranda rights, Martin twice verbally waived his rights and agreed to speak with the interviewing officers. (Gov. Ex. 1 at 1:18–1:24, 33:04–33:09). Martin disputes the voluntariness of his waiver since he told the officers that he was experiencing health problems. [Doc. 30 at 22–23]. However, the totality of the circumstances indicate that Martin validly waived his rights and voluntarily agreed to speak to the officers. The video recording of the officers' entry

of the residence to execute the search warrant depicts Martin exiting the bedroom under his own power and walking toward the front door as directed by the officers. (Def. Ex. 1 at 2:12–2:20).  Upon reaching the porch, Martin was handcuffed and then seated on the porch steps.  See (Tr. at 45; Def. Ex. 1 at 5:49–5:51).  Inv. Walker noticed that Martin was sweating, and at some point while he was on the porch, Martin complained that he felt faint and said that he was having some trouble breathing. (Tr. at 11, 46).  The officers on the scene called for an ambulance because they suspected Martin may have swallowed drugs, but Martin adamantly denied it.  (Id. at 11–12; Gov. Ex. 1 at 9:25–10:00; Gov. Ex. 2 at 7–8).  Martin did not request any medical attention or indicate that he needed any medication.  (Tr. at 98–99; Gov. Ex. 4 at 2–6).  Indeed, after the ambulance arrived and he was examined, Martin refused any medical treatment.  (Gov. Ex. 3).  Martin exited the ambulance and walked back to the raid truck under his own power.  (Gov. Ex. 1 at 3:20–3:48).

Both interviews were brief, with the first one lasting about 15 minutes, and the second one only 10 minutes.  (Gov. Ex. 1 at 1:18–16:20, 31:46–38:40).  Sgt. Peek advised Martin of the nature of the investigation at the outset of the interview.  (Id. at 1:18–2:03; Gov. Ex. 2 at 2–3).  Martin had prior experience with the judicial system, acknowledging to Sgt. Peek that he had previously been incarcerated.  (Gov. Ex. 1 at 2:30–2:57; Gov. Ex. 2 at 4–5).  None of the interviewing officers threatened Martin,

26

yelled at him, or promised him anything to induce him to waive his rights.  <u>See</u>

(Gov. Ex. 1 at 1:18–16:20, 31:46–38:40; Gov. Exs. 2 & 4).  Both interviews were

conducted in a casual, conversational tone, and despite his complaints, Martin

appeared to the interviewing officers to be coherent and competent, and his answers

to their questions were responsive and appropriate to the subject matter of the

interview.  <u>See</u> (Gov. Ex. 1 at 1:18–16:20, 31:46–38:40; Gov. Exs. 2 & 4).  The video

recording of the interviews likewise demonstrates that, although Martin made a few

complaints about how he was feeling, he remained coherent and capable of

understanding what was being said to him, and he provided relevant responses,

even disagreeing at times with the interviewing officers on some points.  <u>See</u> (Gov.

Ex. 1 at 1:18–16:20, 31:46–38:40).   Accordingly, the Court finds that Martin

knowingly, intelligently, and voluntarily waived his rights and agreed to speak with

the interviewing officers, and it is **RECOMMENDED** that his motion to suppress

statements, [Doc. 15], be **DENIED**.  <u>See</u> <u>United States v. Lazarus</u>, 552 F. App'x 892,

896 (11th Cir. 2014) (per curiam) (unpublished) (affirming district court's finding

that defendant's statements were voluntary where the statements where made when

defendant "felt tired and faint, but was lucid, understood all of the agents'

questions, [] was not nervous," and "rose from the couch under her own power

when the agents arrived," and where she "was never told she was required to

answer any questions, [] was not threatened by the agents, and [] did not ask that the interview end"); Durr, 2010 WL 3199887, at *5–6 (rejecting defendant's argument that "extreme" pain rendered his statements involuntary, since, despite his complaints of pain during arrest, defendant agreed to waive his Miranda rights and to speak with police, and he appeared to understand the questions asked of him and to provide responsive answers); see also Durr, 2010 WL 3199887, at *5 (quoting Reid, 891 F.2d at 1020) ("[S]tatements were voluntary where defendant was hospitalized with knife wound, had intravenous tubes and was in 'significant pain,' but was 'alert and awake despite his pain[.]'").

## III.  CONCLUSION

For the reasons stated, it is **RECOMMENDED** that Martin's motions to suppress, [Docs. 15 & 16], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is not aware of any problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 29th day of June, 2015.

*Russell G. Vineyard*
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE